Caruthers, J.,
delivered the opinion of the Court.
The plaintiff hired his negro man, Warren, to the defendant for the year 1852, and took his note for the price. The defendant was- the keeper of a livery *277 stable in the city of Nashville. There was no stipulation in the contract, ns to the object for which the boy was hired, or the particular kind of service to be rendered; but it was the ordinary case of general hiring, without any expressed restrictions or limitations. In March, the defendant hired the negro to Mr. Parish, to drive his dray to and from the wharf at Nashville. Whilst thus employed, the negro received an injury in his . breast, by a dray running over him. The proof leaves it doubtful whether or not he ever entirely recovered from this hurt. The plaintiff, on learning that his slave was thus employed, saw and requested the defendant, if he did not want the boy at his stable, to hire him to the Corporation, to work on the streets. This the defendant refused to do at the time, but afterwards, when the negro had served several weeks at the whai’f, and had somewhat recovered from his hurt, took him back and hired him to the Corporation, where he sickened and died of typhoid fever. It does not clearly appear whether or not the injury in his breast contributed to the origination of the attack of fever or its fatal termination. As to this, the doctors doubt. There is no proof of want of due care and attention to the boy, either in sickness or in health.
This case presents a question of very high impor" tance, which has never, perhaps, been expressly adjudicated in this State; that is, whether a general hirer of a slave can sub-hire him under any circumstances, without the owner’s consent, and not be guiity of a conversion, and liable for his value in an action of trover, at the election of the owner.
*278 This question was referred to in the case of Mien vs. Price, 9 Humph., 712, as an open one, and worthy of very grave consideration, when it should arise. We have endeavored to bestow upon it that consideration which its importance to society deserves, and have not arrived at the conclusions to be now announced, without much hesitation and doubt. It is a question so closely connected with the every day transactions of men in slave States, that it is not easy to avoid the risk of doing- injustice in particular cases, by any general rule on the subject; yet it is of the first importance that the law should be distinctly understood upon it, that hirers and letters to hire may know their rights and duties, and govern themselves accordingly.
In all the’ rules and regulations made by the Legislature and the Courts, in relation to this species of property, it has been very properly and humanely kept in view, that negroes have minds and souls and feelings, as well as their masters. It may be further said with truth that the owner generally has a special' care of the comfort, happiness, and safety of his slave, in any disposition he may make of him or .his services. To this end the Courts have also contributed, so far as practicable under the rules of law. It is very fortunate that the interest and duty, the selfish and kindly feelings of the owner, concur in impressing him with the necessity of providing for the safety and well being of his slaves, in all his regulations in relation to them. That all his arrangements and contracts will be directed to these ends, may then well be presumed.
*279 When the master’s interest requires him to commit, for a season, the use and control of his slave to another for hire, a due regard for his safety and comfort would require that he should have an eye to the kind of labor he is to perform, and the person by whom he is to be taken care of and controlled. Duty to his slave, as well as the dictates of prudence in relation to his own interest, would require that he should not subject his slave to the hazards of a dangerous employment, nor to the power of an unfeeling temporary owner.
This Court has settled various questions on this subject, to the reports of which, in connection with other according authorities, a brief reference will be made.
1. That where the contract is for particular kind of labor, it will be a conversion by the hirer to put the slave at any other, without regard to its character, or whether it be more or less hazardous.—Angus vs. Dickerson, Meigs, 469. The Court also hold, in this case, that if the slave was hired to Angus specially to drive his wagon, and he sub-hired him to Love for the same employment, it would be a conversion. The reason given is, that “ The owner of a slave might be.very willing to hire his servant to A. to drive his wagon, and at the same time, would by no means agree that he should be employed under B. to drive his wagon.”
Vanleer vs. Fain, 6 Yerg., 104-7, decides, that the violation on the part of the bailee of a condition in a public hiring, not to take a slave out of the county, is a conversion.
Before that, it was decided, in Horsely vs. Branch, *280 1 Humph., 208, that where the contract was that the slave should not work in or about the water, that it amounted to a conversion to thus emply him, and his value could be recovered by the owner, although no injury may have resulted from the misemployment, but occurred afterwards, by inevitable accident, when rightfully employed. And, in the late case of Price vs. Allen, 9 Humph., 710, the same doctrine is reiterated and applied to a case where one man hired a slave to work on his own place, and sub-hired him to another to work for him a part of the time. This was held to be a conversion.
These are all cases of what is called special, as contradistinguished from general hiring. The first embraces all cases where some particular kind or place of labor is specified or excluded, and the other, where the contract is general for the use of the slave, without designation of the place where he is to be employed, or the kind of labor he is to perform. In Mullen vs. Ensley, 8 Humph., 428, it was held, that in a case of general hiring, it was implied that the bailee should only put the slave to such “ordinary and usual employment as men of ordinary discretion and prudence would usually be willing to engage their own slaves in,” and that the blasting of rock was not of that description, being attended with more personal danger than the usual vocations of life; “and that a bailee who has hired a negro for general and common service, has- no right to employ him in such an occupation, without the consent of his owner, and if he does, it is a conversion of the slave, and he is responsible for his value to the owner, if *281 be think proper so to consider it, but if not, tha* he is responsible to him for any injury the slave may sustain while engaged in this unlawful employment, which may be recovered by an action on the case.”
All these cases proceed upon the ground that the unlawful assumption of ownership on the part of the bailee for hire is a conversion in law, and subjects the hirer to an action of trover for the value, or an action on the case for any injury sustained to the property, at the election of the owner. Any authority or power exercised over the property of another not authorized by the contract or consent of the owner, is unlawful, and amounts to a tort, which maybe redressed by an action of trover. Our cases are all well sustained by the authorities.—Story on Bailments, §§ 396, 413; 2 Saund. R., 47 f. and notes; 2 Camp. R., 335; 8 Leigh, (Va.,) 565; 1 Rice, 182; 4 U. S. D., page 244.
The contract of hiring does not, as is sometimes loosely expressed, transfer the right of property in the slave to the bailee for the term; and from this erroneous idea some false conclusions as to the rights and powers of the hirer are probably attributable. The owner, by this kind of bailment, parts with the use, possession and control of the property for the time agreed upon, and nothing more passes to the hirer. The title does not pass, nor is it in any way affected. The labor of the slave is sold for a time, but not the slave himself. If the property passed by the contract, the consequences might be very, different. It is also important to consider, in order to arrive at correct conclusions on this subject, that the relation established by *282 this description of bailment is one of trust and confidence. The bailee takes upon himself certain duties and responsibilities, as well as rights and powers. In the case of slaves, being rational creatures, this attribute in the relation, created in the contract of hiring, becomes a more prominent feature than in the case of other property. The hirer is bound by law, independent of any contract to that effect, or, in other words, such a contract is implied, to provide for the comfort and safety of a slave, in sickness and in health. He is liable for a failure to procure medical aid when necessary, and to furnish such other attention and care in sickness as may be necessary. His treatment must be, in all respects, such as ordinary masters bestow on their own slaves. It is unfortunate that it is the interest of the hirer to get all the labor he can out of the hired slave, without regard to his comfort, or the effect upon his permanent health and value. To guard against the influence of this selfish feeling, as well as for their justice and propriety, the above rules have been established for the protection of the owner and his property. It is the dictate of justice as well as humanity, that the master have the selection of the person to have charge and control of his slave. It is a relation which involves trust and confidence, and unless this is an exception to the general rule in such cases, it cannot be changed or delegated without consent. The hirer, if that principle applies, cannot denude himself of the obligation imposed, or transfer them to another, without the owner’s consent. He has been chosen and trusted, and not another. Can another be substituted, then, *283 without the consent of the owner? If so, there is no advantage in 'the right of choosing who shall be trusted with my slave; my right and duty to save, him from the control of a cruel and unfeeling man, a hard master, is unavailing; my right of selection is nugatory. If the right to sub-hire exists, the very man I would avoid may get Rim the next day. It is well known in practice, that a kind master would not entrust his slave to some men at all, or would take much less from others. It is not enough to satisfy this laudable feeling, that the' law will give redress for an injury to the slave, because the mental suffering and bodily agony may be great, without any injury for which an action would lie. The right of the owner to choose a temporary master, to the exclusion of others, is laid down by the Court in the case of Angus vs. Dickerson, Meigs, 469, thus: “An owner of a slave might be very willing to hire his servant to A. to drive his_ wagon, and at the same time, would by no means agree that he should be employed under B. to drive his wRgon.” It is true, this has reference to a special hiring — that is, the employment is designated. But still, the case put, negatives the right to transfer the service, though of the same .kind, to another.
This case illustrates the necessity of the restriction. Here the boy was hired to a Livery Stable keeper, which is comparatively a safe and easy business, and he is put to driving drays amidst dangers and exposures and then with a crowd of hands, upon the public streets, under a hard public driver, where the wages are higher in proportion to the expense and *284 hazard. It may be said, that there is no necessity of extending the principle of restriction beyond cases of special contracts or special hirings, as the owner can easily limit the power of the hirer as he chooses, in his contract. It is a sufficient answer to that argument, that the bailee can, if he desires an enlargement of his rights, so as to allow him to subhire, insert a term to that effect in the contract, consequently that argument proves nothing, and leaves the question as it found it.
The main question still comes up, and cannot be avoided, does the contract, in the case of a general hiring, communicate to the bailee the right to hire the slave to another, without the sanction of the owner ? If not, it is the exercise of a power not conferred, and implies the assumption of ownership, and therefore amounts to a conversion, and is good ground for an action of trover, A person who takes a thing to hire, engages, 1st, “to put it to no other use than that for which it was hired; 2d, to use it well; 3d, to take care of it; 4th, to restore it at the time appointed; 5th, to pay the rent or hire, and in general to observe whatever is prescribed by the contract, by law and by custom.”'—Story on Bail. sec. 397. If these are the duties imposed, are they not incompatible with the rights to transfer the use and possession of the property to another, without the assent of the bailor? It is believed that no fair interpretation of the contract, as it must have been understood by the parties, will permit it. The authority to use and control, in his own service and under Ms legal responsibilities, is all the' power communicated to the hirer, *285 or parted with by the owner. The grant of a defined power, excludes all other power from the grantee, and reserves the same to the grantor. Any use or disposition of another’s property, without authority, is a tortious act, and amounts to an actual conversion. The right, then, to select a temporary master for my slave, belongs to me and no one else can exercise it without a false assumption of ownership, which is a tortious act, and may be treated by me as an unlawful appropriation of my property, and I may recover the value in trover.
We are then, necessarily brought to the conclusion, by the force of this principle, that the simple act of sub-hiring, without the assent of the owner may be •treated as a conversion of a . slave, and subject the bailee to an action of trover for the value. It is a tort, which terminates the contract of hiring, at the election of the bailor, and renders the bailee immediately liable to the action. This is the most safe and convenient rule on the subject — is most in accordance with general principles, and the least liable to be misunderstood by the community. There will be but few cases of hardship under it, as parties will regulate their contracts and shape their conduct in reference to it. In all proper cases, where the hirer wishes to sub-hire, he will have no difficulty in obtaining the assent of the owner. The very common transactions of hiring, and the relative duties and powers of the parties will be more easily understood under this rule. The efforts of the owner under the dictates of interest and humanity, to procure good homes and *286 •kind treatment for his slaves, will under this simple rule, be far less liable to frustration.
This, however, like any other tort, may be waived, either expressly or by implication. It is not a wrong at all, if sanctioned before it is done, nor is it actionable if afterwards sanctioned, although a violation of the original contract: for the essence of the wrong consists in the usurpation of a power over the property, which can only be exercised by the owner, and is not delegated by the bailment. The effect of it in law, is to change the ownership and render the wrong-doer liable for the value, at the election of the owner. Now, any act, or course of conduct on the part of the latter, with full knowledge of what has transpired, which goes to sanction the act, or which indicates that he still claims to be owner, would amount to a waiver of the tort, and his right to recover the value as for a conversion, and leave him only a right to resort to an action on the case, in which the injury done by the tort, if any, could only be recovered, without a change of the property.
If the slave be taken back, at or before,' the expiration of the term of hire, or if the hirer, in any other way assumed to be and held himself out as owner, after knowledge of such conversion, as if by the contract he was to furnish the necessary clothing, which he continued to do, subsequently, he could not maintain trover and recover the value. In a case where no injury to the slave resulted from the sub-hiring, and he was safely returned to the first hirér, but afterwards died, or was injured by disease, or inevitable accident, whether before the accident, mere *287 delay, of itself, to assert the right to recover as for a conversion, under the full knowledge of the facts, would amount to a waiver, we need not now determine. That might depend upon the length of the delay, and other circumstances.
We do not say in this case that full force and eifect were given to the acts of the plaintiff, going to show a waiver, or that the court expounded the law with exact correctness on that part of the case, hut this action being in both case and trover, and the finding general, we think it is sustained by the facts and the law, and will not disturb it.
Let the judgment be affirmed.